1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9   The State of Arizona, et al.,              )   No. CV-11-1576-PHX-GMS
                                               )
10                  Plaintiffs,                 )   **ORDER**
                                               )
11  -and-                                       )
                                               )
12  Monica Kuhlt,                               )
                                               )
13                  Intervenor-Plaintiff,       )
                                               )
14  vs.                                         )
                                               )
15  City of Cottonwood, et al.,                 )
                                               )
16                  Defendants.                 )
                                               )

17

18          Pending before the Court are Plaintiffs' Motion for Partial Summary Judgment (Doc.

19  22), Defendants' Motion for Summary Judgment (Doc. 24), and Defendants' Motion to

20  Strike the Declaration of Roger E. Millsap (Doc. 36). For the reasons stated below, Plaintiffs'

21  motion is granted and Defendants' motion is granted in part and denied in part.[1]

22                              **BACKGROUND**

23          In or around the year 2000, Fitness Intervention Technologies ("FIT") conducted a

24  statewide study on police officers for the purpose of developing a physical fitness test for

25

26  _____

27  [1] The parties' requests for oral argument are denied because the parties have had an
    adequate opportunity to discuss the law and evidence and oral argument will not aid the
28  Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*, 933 F.2d
    724, 729 (9th Cir. 1991).

Arizona law enforcement officers. (Doc. 23 ¶ 9). The study was conducted pursuant to agreements with the Arizona Peace Officers Standards and Training Board ("AZ POST") and a number of law enforcement agencies within the state. (*Id.*) According to a later-prepared validation study, FIT tested 632 police officers' ability to perform job-specific tasks, such as clearing a car from a roadway, pursuing a suspect, or extracting a person from a vehicle. (Doc. 25-7, Ex. 4b at E3). It then tested the officers' performance on a battery of physical tests, and correlated the officers' performance on the job-specific tasks with their performance on the physical fitness tests. (*Id.* at E4–E6). Based on the study, FIT recommended that police officers within the City of Phoenix, where the test was to be implemented, be able to meet the following standards on a battery of seven physical tests: 1) complete an agility run in 18.2 seconds or faster, 2) bench press either 175 pounds or 79% of the officers' body weight one time, 3) jump sixteen inches vertically, 4) run 300 meters in 60 seconds or faster, 5) do 30 push-ups in succession, 6) do 34 sit-ups in one minute, and 7) run 1.5 miles in 15 minutes and 4 seconds or faster. (Doc. 23 ¶ 3). FIT recommended that Phoenix require both incumbent officers and officer applicants to meet all of these standards, and made no recommendations regarding promotions. (Doc. 25-7, Ex. 4b at G16–20).

FIT presented the results of its study to the board of AZ POST, but AZ POST's Executive Director, Lyle Mann, rejected the standards before the board took any steps to adopt them. (Doc. 23-1, Ex. E at 33:19–34:8). One issue of concern was that the use of absolute benchmarks for all officers could potentially have an adverse impact on women. (*Id.* at 40:11–17). More important to the decision, however, was the fact that FIT had assumed during its testing that officers who did not meet FIT's standards for the job-specific tasks were not qualified to be police officers, when in fact there was "no indication that everybody wasn't doing their job just fine." (*Id.* at 41:17–18). Because Mann found that the failure was "a problem with the methodology in the establishment of a cut line," he "simply shelved" the proposal from FIT. (*Id.* at 41:18–22).

In February of 2005, Douglas Bartosh, who had been Chief of Police in Scottsdale during the period in which FIT conducted its study, was hired as the Chief of Police in

Cottonwood, Arizona ("the City"). (Doc. 25 ¶ 3). In December of 2006, the Cottonwood Police Department ("CPD") adopted General Order 206 ("GO 206"). (Doc. 25-16, Ex. 10). The order required that CPD sworn officers meet or exceed the standards recommended by FIT in the earlier study. (*Id.*). Under GO 206, applicants were required to meet or exceed the FIT standards before being hired, and incumbent officers were tested twice annually. Incumbent officers were given three years to meet the FIT standards, and officers who could not pass the FIT standards had the opportunity to pass a job task simulation test ("JTST") instead. (*Id.*). GO 206 did not require that officers seeking promotion meet the FIT standards; in fact, it does not mention promotion in any way.

At around the same time that CPD issued GO 206, however, it announced that it was hiring for two sergeant positions. (Doc. 23-1, Ex. C). In the announcement, CPD stated that following a written and oral exam, "candidates will be required to successfully complete the minimum standard outlined in the new fitness policy, General Order 206." (*Id.* at 2). The requirement was added to the promotion materials by Bartosh, who said that "[t]he details of the promotional process is my decision, and I put those requirements together." (Doc. 23-1 at 137:9–10). When asked at his deposition why candidates were required to pass the FIT standards to be promoted when GO 206 provided them, as incumbent officers, with three years to meet the standards, Bartosh said that "[i]f you're going to promote somebody, generally you want somebody who is going to set the example, be a leader, have credibility with the people that they're going to lead." (Doc. 23-1 at 14–17).

Detective Monica Kuhlt applied for a promotion to sergeant during the January 2007 promotion process. (Doc. 23 ¶ 20). Det. Kuhlt had been employed by CPD since 1997, and had held various positions, including as a patrol officer, a special assignment on a narcotics task force, and as a detective. (Doc. 23 ¶ 22). In her three most recent annual evaluations, Det. Kuhlt had received two summary evaluations of "Exceeds Job Standards," the fourth-highest of five ratings, and one summary evaluation of "Superior Performance," the highest of five ratings. (Doc. 23-2, Exs. M–O). In 2004, she was evaluated as having a "Good Solid Performance" in the subcategory of "Has necessary physical conditioning to safely perform

assigned duties." (Doc. 23-2, Ex. M at 5). Although this sub-category was discontinued in the 2005 and 2006 evaluations, she was evaluated as "Exceeds Job Standards" and "Superior Performance" in the broad category of "Work Habits and Physical Factors" in those two years respectively. (Doc. 23-2, Exs. N, O). Kuhlt took the written and oral portions of the sergeant's exam, and received the second-highest score of those who took the test. (Doc. 23 ¶ 28).

Det. Kuhlt took the physical test on April 25, 2007 and did not meet the FIT standards; she again took the test on July 10, 2007 and did not pass it. (Doc. 23 ¶ 32). Each time she took the test, she met the standards for the bench press, the push-ups, and the sit-ups. She failed to meet the standards for the agility run, the 300-meter run, and the 1.5-mile run. She passed the vertical jump on one occasion and failed it on the other. (Doc. 23 ¶ 32). At some point in 2007, Det. Kuhlt presented CPD with a letter from her doctor stating that she was being treated for "re-exacerbation of low back pain," and that "intense physical activity [should] be avoided until Oct. 31, 2007." (Doc. 25-19, Ex. 17). On October 17, CPD placed Det. Kuhlt on light duty "until you have been cleared by your physician for full duty including the fitness testing." (Doc. 23-3, Ex. T). On the same day, Bartosh wrote a memorandum to Det. Kuhlt stating that he was skipping her on the promotional list because she had not met the FIT standards and because "[y]ou also stated that you were unsure when you would be prepared to participate in fitness training." (Doc. 23-3, Ex. S). On January 16, 2008, Kuhlt again took the test; she again met the FIT standards on some of the parts of the test and not on others. (Doc. 23 ¶ 37). In February of 2008, Bartosh became the City Manager of Cottonwood, and Jody Fanning became the Interim Chief of Police; Fanning became Chief of Police in June of 2008.

On April 4, 2008, Det. Kuhlt wrote Fanning a memorandum in which she expressed her concerns about the FIT test. (Doc. 25-19, Ex. 22). In the memo, she noted that of the three women in CPD, only one had passed the test, and that the woman who passed it had subsequently failed it. (Doc. 25-19, Ex. 22). She wrote that "[t]he physical fitness standard has a disparate impact on women when compared to how the same standard affects men."

1   (*Id.*). She concluded that she believed that "the issues I have encountered while trying to get

2   promoted are like the 'glass ceiling' affect [*sic*]." (*Id.*). On April 21, 2008, Det. Kuhlt was

3   provided with a letter from Deputy Chief Fanning. (Doc. 25-19, Ex. 23). The letter stated that

4   "[y]our perception that the tests are difficult for women to pass is well founded," and noted

5   that a study conducted by FIT "found that there is a disparate impact on women with these

6   standards." (Doc. 25-19, Ex. 23). The letter also stated that, according to FIT, the standards

7   "are established to guarantee *minimal* fitness to perform the strenuous tasks of the job." (Doc.

8   25-19, Ex. 23) (emphasis in original). In his deposition, Fanning acknowledged that the letter

9   was written entirely by the City Attorney, and that he had not edited or amended the letter

10  after it had been provided to him. (Doc. 30-3, 122:20–23). Fanning stated in his deposition

11  that he did not understand how the FIT standards were developed or validated, that he had

12  not seen charts showing the pass rates of women and men on the various elements of the test,

13  and that he had no specific knowledge of any facts that suggested that Det. Kuhlt could not

14  meet the minimal standards of being a law enforcement officer. (Doc. 30-3, 124:8–125:11).

15      In May of 2008, two more sergeant positions became available; for the 2008 hiring

16  process CPD revised its application procedure so that applicants were required to take the

17  FIT test before taking the written and oral exam, and those who failed the FIT test were not

18  permitted to take the oral and written exams. (Doc. 23 ¶¶ 40–41). During the physical fitness

19  test, Det. Kuhlt injured her back, and therefore did not take the oral or written portions of the

20  promotional exam. (Doc. 25 ¶ 76; Doc. 23 ¶ 43).

21      Kuhlt filed a charge of discrimination on May 6, 2008 with the Arizona Attorney

22  General's Office Civil Rights Division ("CRD"), alleging that the physical fitness test

23  constituted sex discrimination because of its disparate impact on women. (Doc. 25-23, Ex.

24  41). On February 13, 2009, CRD dismissed Kuhlt's complaint. (Doc. 25-23, Ex. 42). On

25  March 9, 2009, Det. Kuhlt wrote CRD and asked that it re-open her case. (Doc. 30-3, Ex. P-

26  1). In her letter, Kuhlt stated that two recent applicants—a female state-certified Phoenix

27  police officer and a male civilian—had both failed one portion of the FIT test, and the female

28  officer had been sent home, while the male officer had been allowed to retake the portion of

1   the test that he had failed. (*Id.*). On April 1, 2009, CRD re-opened the case, and issued a

2   Reasonable Cause Determination on April 28. (Doc. 30-3, Ex. P-2–4). In its response to the

3   Reasonable Cause Determination, the City's attorney wrote, "[t]o be clear, the City does not

4   dispute the fact that the physical fitness standards set forth in General Order 206 have a

5   disparate impact on women." (Doc. 30-3, Ex. P-4). In April of 2009, Kuhlt provided the

6   officer conducting fitness training with a note from her doctor stating that she could take the

7   fitness test, but that she should not run, and suggesting that instead she walk for two miles.

8   (Doc. 25-19, Ex. 26). Officers from the CPD contacted the doctor, who confirmed that his

9   only concern was the 1.5 mile run, and suggested that Det. Kuhlt's aerobic ability be tested

10  by a non-impact activity such as walking or riding a stationary bike. (Doc. 25-19, Ex. 28).

11  The CPD then scheduled an appointment for Det. Kuhlt with another doctor, who determined

12  on May 13, 2009 that Det. Kuhlt was not fit for duty as a police officer. (Doc. 25 ¶ 117).

13  Kuhlt filed another charge of discrimination in June of 2009, alleging, among other things,

14  that the evaluation was scheduled and her duty was modified in retaliation for her sex-

15  discrimination complaint. (Doc. 25-19, Ex. 21). Kuhlt was placed on light duty until October

16  21, 2009, when she was approved for full duty by another doctor. (Doc. 25 ¶ 136).

17          In October of 2010, CPD changed the test that it uses to evaluate the physical fitness

18  of its officers, substituting the Peace Officers Physical Aptitude Test ("POPAT") for the FIT

19  test. (Doc. 23 ¶ 46). The POPAT requires officers to climb over a solid fence, climb over a

20  chain-link fence, run a 99-yard obstacle course, drag a 165-pound dummy, and run 500

21  yards. (Doc. 23 ¶ 47). Although POPAT is commonly used in police academies, AZ POST

22  does not recommend using it for in-service evaluations because of the risk that officers will

23  be injured taking the test and because building and maintaining a course is costly. (Doc. 23-1,

24  22:20–23:13).

25          This lawsuit was originally filed by the CRD in Maricopa Superior Court on May 5,

26  2009, alleging violations of state civil rights law. (Doc. 1-1). After over two years of

27  litigation, Det. Kuhlt filed an Amended Complaint asserting federal claims for the first time.

28  Defendants removed the suit to federal court on August 8, 2011. (Doc. 1). The Amended

1   Complaint contains claims of disparate impact, disparate treatment, and retaliation under
2   Arizona state civil rights law, Title VII, and 42 U.S.C. § 1983. (Doc. 1-7).

3       Both parties have moved for summary judgment on the disparate impact claim.
4   Defendants have moved for summary judgment on all claims.

5                                   **DISCUSSION**

6   **I.    Legal Standard**

7       Summary judgment is appropriate if the evidence, viewed in the light most favorable
8   to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact
9   and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Substantive
10  law determines which facts are material and "[o]nly disputes over facts that might affect the
11  outcome of the suit under the governing law will properly preclude the entry of summary
12  judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "[A] party seeking
13  summary judgment always bears the initial responsibility of informing the district court of
14  the basis for its motion," including identifying portions of the record that demonstrate the
15  absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323
16  (1986).

17      Once the moving party has detailed the basis for its motion, the party opposing
18  summary judgment "may not rest upon the mere allegations or denials of [the party's]
19  pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial."
20  FED. R. CIV. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,
21  586-87 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995);
22  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "A fact issue is genuine 'if the evidence
23  is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v.*
24  *Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson,* 477 U.S. at
25  248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved
26  only by a finder of fact *because they may reasonably be resolved in favor of either party*.'"
27  *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th
28  Cir. 1987) (quoting *Anderson*, 477 U.S. at 250; emphasis in original). "[A]t the summary

1  judgment stage the judge's function is not himself to weigh the evidence and determine the

2  truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477

3  U.S. at 249.

4          A principal purpose of summary judgment is "to isolate and dispose of factually

5  unsupported claims." *Celotex*, 477 U.S. at 323–24. Summary judgment is appropriate against

6  a party who "fails to make a showing sufficient to establish the existence of an element

7  essential to that party's case, and on which that party will bear the burden of proof at trial."

8  *Id.* at 322; *see Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994). The moving

9  party need not disprove matters on which the opponent has the burden of proof at trial. *See*

10  *Celotex*, 477 U.S. at 323.

**II.    Analysis**

12         This order will first consider the disparate impact claim, on which both parties have

13  moved for summary judgment, and then consider the remaining claims, on which only

14  Defendants have moved for summary judgment.

**A.    Disparate Impact**

16         Plaintiffs have filed disparate impact claims under both Title VII and the Arizona

17  Civil Rights Act ("ACRA"). *See* 42 U.S.C. § 2000e-2(k)(1)(A)(I); Arizona Revised Statutes

18  ("A.R.S.") § 41-463(B)(1). The claims will be analyzed under the federal framework,

19  because "federal case law is persuasive in interpreting the state statute." *Sees v. KTUC, Inc.*,

20  148 Ariz. 366, 368, 714 P.2d 859, 861 (App. 1985). Courts analyze claims of disparate

21  impact in three steps. First, a plaintiff must show "that an employer uses a 'particular

22  employment practice that causes disparate impact on the basis of race, color, religion, sex,

23  or national origin.'" *Ricci v. DeStefano*, 129 S. Ct. 2658, 2673 (2009) (quoting 42 U.S.C. §

24  2000e-2(k)(1)(A)(i)). Although this first step is described as making a "prima facie" case,

25  the burden on the plaintiff is higher during the first step of a disparate impact claim than the

26  "prima facie" case in a disparate treatment case—the plaintiff must "demonstrate[]" that the

27  practice causes a disparate impact, with "demonstrate" defined by statute to mean "meets the

28  burdens of production and persuasion." 42 U.S.C. §§ 2000e(m), 2000e-2(k)(1)(A)(I). The

Ninth Circuit has held that the Plaintiff must "prove any such charge by a preponderance of the evidence." *Paige v. California*, 291 F.3d 1141, 1145 n.4 (9th Cir. 2002).

Once the plaintiff has established a prima facie violation by a preponderance of the evidence, a defendant bears the burden of "demonstrating that the practice is 'job related for the position in question and consistent with business necessity.'" *Ricci*, 129 S. Ct. at 2673 (2009) (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(I)). Should the employer meet this burden, a plaintiff "may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." *Ricci*, 129 S. Ct. at 2673. The Court will discuss these factors in turn.

### 1. Prima Facie Case

To meet their initial burden, Plaintiffs must identify "1) a specific employment practice that 2) causes a significant discriminatory impact." *Paige*, 291 F.3d at 1145. Here, no party disputes that Plaintiff has identified the specific practice of using the fitness standards set fort in the FIT test as a requirement for promotion to sergeant.

Plaintiff offers four pieces of evidence that the test causes a discriminatory impact: a declaration by Roger E. Millsap that the results of FIT's own validation study demonstrate that the test has a disparate impact on women (Doc. 36), the results of people who took the test as administered by CPD, the letter from Chief Fanning stating that the FIT study "found that there is a disparate impact on women with these standards," (Doc. 25-19, Ex. 23) and the letter from the City stating that "[t]o be clear, the City does not dispute the fact that the physical fitness standards set forth in General Order 206 have a disparate impact on women." (Doc. 30-3, Ex. P-4).

### a. Millsap Declaration

In its validation study, FIT reported some of the results of the initial tests in Phoenix. (Doc. 23-2, Ex. I at G28–29). Defendants argue that Plaintiffs may not rely on these alleged results to show that females pass the test at a lower rate then males, because the results are inadmissible hearsay. (Doc. 24 at 3–4). Plaintiffs note that Defendants have previously acknowledged that the results show that women pass the test at much lower rates than men,

and claim that the results themselves are therefore admissible as a statement against interest or an admission by a party-opponent. *See* FED. R. EVID. 801(d)(2), 804(b)(3). Although the parties' statements regarding the test, as discussed below, are admissible as statements against interest, they do not serve to render the FIT report to which they refer admissible. FIT is not a party to this action and therefore its report is not a "party's own statement." Rule 801(d)(2) is not applicable. Rule 804(b)(3) is only applicable if the declarant is unavailable; Plaintiffs have not argued that the declarant for the FIT report is unavailable. The results of the 2001 test, as reported in the validation study, are inadmissible hearsay.

Nevertheless, Plaintiffs' expert, Roger Millsap, has submitted a declaration evaluating the results of the FIT study. Dr. Millsap calculated the likelihood that, despite the results of the FIT study, females could be expected to pass the elements of the battery of tests at 4/5ths the rate of men. He found that on six of the seven tests, the probabilities that women would pass at such rates was two-one-thousandths of a percent. (Doc. 33-1, Ex. 1-A).

Defendants' motion to strike Dr. Millsap's declaration was denied, and they were offered the opportunity to submit any evidence rebutting his conclusions. (Doc. 40). They declined to do so, instead submitting a "response" to the declaration challenging its admissibility. (Doc. 41). Defendants contend that because Cottonwood administered the test "under circumstances that are fundamentally dissimilar to the City's testing program" and because Dr. Millsap "has no knowledge of how the FIT study participants would perform if they were re-tested following a training regimen," Dr. Millsap's conclusions regarding the FIT results are not admissible as evidence that women pass the City's testing regimen at a disparate rate from men. (Doc. 41 at 2). They further contend that the underlying FIT study—the very study upon which they otherwise rely to claim that the City's testing program has been properly validated—is not "the type of trustworthy material that is reasonably relied upon by experts in the field." (*Id.*). Both arguments lack merit.

It is true that the participants in the FIT study were not given an opportunity to train for the test, and were not told what benchmarks were considered passing. They were, however, all police officers who were recruited to take a physical fitness test; they were not

a random population sample. To the extent that Defendants argue that the disparities between women and men's performance on the test would disappear with training, only a month elapsed between the time that GO-206 was issued and Det. Kuhlt took the test as part of her application. The fact that officers were granted three years to pass the test is not relevant to the use of the test with regards to the promotional process, as discussed in greater detail below. Given the similar populations that took the FIT test and the City's test and the identical requirements for passing the test, the fact that Det. Kuhlt could have trained for a month prior to the test does not reduce the reliability of Dr. Millsap's conclusions.

Nor are the underlying data so unreliable that Dr. Millsap's report must be excluded. When an expert gives testimony based on statistics "of a type reasonably relied upon by the experts in the particular field in forming opinions or inferences on the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." FED. R. EVID. 703. Defendants cite one case in which expert testimony was excluded because the underlying information on a document was described by its creator as a "a reverse guestimate," and the expert had admitted that "he did not know what the document was, who created it, or how it was created." *Montgomery Cty. v. Microvote Corp.*, 320 F.3d 440, 448–49 (3d Cir. 2003). In *TK-7 Corp. v Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993), also cited by Defendants, a  purported expert opinion was rejected when the court determined that the person "professed no expertise" with regards to the subject matter of his testimony but merely "assumed the validity" of another's report "despite the fact that he knew little or nothing at all" about its author. Such problems are not present here. Defendants themselves rely on the FIT study when they claim that the test has been properly validated. (Doc. 25 ¶ 20–22). It was proper for Dr. Millsap to rely upon it as well.

Dr. Millsap's declaration regarding the FIT study is admissible. Dr. Millsap's analysis of the FIT study is "sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994 (1988).

**b.    Actual Test-takers**

The results of the test as it was actually administered by the City also support a claim of disparate impact. The City administered the test to ten women (three incumbent officers and seven applicants) and to ninety men (thirty-eight incumbent officers and fifty-two applicants). Two women passed the test, for a passage rate of 20%, and seventy-one men passed, for a passage rate of 79%. (Doc. 30-5, Exs. BB–DD). Defendants argue that "the City employed only four female officers during the period that the test was used, and that two of the females passed the test." (Doc. 2). They arrive at this figure, apparently, by counting the three incumbent females who took the test (one of whom passed), along with the one applicant female who passed the test and thereby became an incumbent. The record shows that this female took the test a total of one time, on July 12, 2008, as an applicant. (Doc. 30-5, Ex. BB). Defendants offer no reason why the test this person took as an applicant should be included, while the six female applicants who failed the test should not. When considering whether a certain employment practice has a disparate impact, the Ninth Circuit disfavors artificially limiting the data available for analysis. *See Hemmings v. Tidyman's, Inc.*, 285 F.3d 1174, 1187 (9th Cir. 2002) ("Federal courts have rejected defendant's arguments that statistical analysis should be limited to a pool of 'qualified applicants' where the job qualification standards are themselves discriminatory"). The best available statistics of actual test-takers include the results of everyone who took the test as administered by CPD.

To establish disparate impact by statistical disparities, "the statistical disparities must be 'sufficiently substantial that they raise . . . an inference of causation. The statistical evidence may not be probative if the data are 'small or incomplete.'" *Shutt v. Sandoz Crop Protection Corp.*, 944 F.2d 1431, 1433 (9th Cir. 1991) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995–97). While courts should therefore regard studies made up of small samples with caution, "[b]y necessity, courts sometimes must rely on statistics derived from small sample groups," because otherwise employees of small organizations would be denied "some of the protections that Title VII provides." *Shutt*, 944 F.2d at 1434.

The Ninth Circuit's approach to analyzing statistics involving limited numbers of applicants is demonstrated in *Stout v. Potter*, 276 F.3d 1118 (9th Cir. 2002). There, thirty-two

men and six women applied for a promotion within the Postal Service. The Postal Service first screened the applicants, and then interviewed those whom it had selected. The screening process (rather than the final selection) was targeted as an employment practice with a disparate impact based on sex. *Id.* at 1122–23. The court expressed caution at considering such a small sample size, but nevertheless proceeded to analyze the results of the screening process. *Id.* at 1123 ("We observe initially that the probative value of any statistical comparison is limited by the small available sample."). In *Stout*, two of the six women, or thirty-three percent, who applied for the promotion made it through the screening stage, while thirteen of the thirty-two men, or forty-one percent, did. The court found that this discrepancy was simply too small to state a prima facie case, particularly in light of the small sample size. *Id.* In some cases the Ninth Circuit has rejected data outright when it is "derived from an extremely small universe." *Morita v. Southern California Permanente Medical Group*, 541 F.2d 217, 220 (9th Cir. 1976) (holding that a sample size of eight people who were promoted over a seventeen-year period was too small from which to draw any inference). It has found that a small sample size can "call[] into question the statistical significance of the 80 percent rule." *Bouman v. Block*, 940 F.2d 1211, 1226 (9th Cir. 1991). Nevertheless, when parties dispute the significance of a small sample size, "the district judge may accept some statistical inferences and reject others based upon his perception of the oral and documentary evidence placed before him." *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1273 (9th Cir. 1981).

Here, although the sample size is relatively small, the disparities are large. The small sample size here suggest that relying on the eighty percent rule alone would not suffice to find disparate impact. However, the men who took the test passed it at a rate of nearly four times that of the women who took it. For the rates to be comparable, six more women, out of ten who took the test, would have needed to have passing scores. Stated another way, although women made up ten percent of those who took the test, they made up less than three percent (two out of seventy-one) of those who passed it. (Doc. 30-5, Exs. BB–DD). Even considering the small sample size, disparities of this magnitude establish Plaintiffs' prima

1  facie case.

2  ### c.  Other Factors

3  In addition to Dr. Millsap's declaration and the results of actual test-takers, other

4  evidence demonstrates that the test had a disparate impact, and that Defendants were aware

5  of this fact. Chief Fanning wrote a letter to Detective Kuhlt that the FIT study "found that

6  there is a disparate impact on women with these standards." (Doc. 30-3, Ex. P-4).  The City

7  itself wrote a letter to the  CRD stating that "[t]o be clear, the City does not dispute the fact

8  that the physical fitness standards set forth in General Order 206 have a disparate impact on

9  women." (Doc. 25-19, Ex. 23). As discussed above, while neither of these statements renders

10 the FIT report a statement against interest, because FIT is not a party, the statements

11 themselves about what the FIT report shows are admissions by party-opponents, and

12 therefore are not hearsay. FED.R.EVID. 801(d)(2).

13 Defendants do nothing to argue that the test as administered has not had an disparate

14 impact on female test-takers. They merely argue, without any evidentiary support, that the

15 actual numbers do not give rise to a result that is statistically significant for establishing a

16 disparate impact. They provide no expert or other testimony from which this court could

17 conclude that Dr. Millsap's analysis or the results of the actual test as administered do not

18 demonstrate a disparate impact. At least twice they have acknowledged that the test has a

19 disparate impact on women, and they disputed the issue for the first time at the summary

20 judgment stage of this litigation.

21 Plaintiffs have presented admissible evidence that the test administered under GO 206

22 had a disparate impact on women. Defendants have offered no evidence that challenges

23 Plaintiffs' evidence. Summary judgment is therefore appropriate in favor of Plaintiffs on the

24 question of whether the test has a disparate impact on women. *See Celotex*, 477 U.S. at 322.

25 ### 2.  Business Necessity

26 Employment tests that have a disparate impact on members of a protected class "are

27 impermissible unless shown, by professionally acceptable methods, to be predictive of or

28 significantly correlated with important elements of work behavior which comprise or are

relevant to the job or jobs for which candidates are being evaluated." *Ass'n of Mexican-American Educators v. California*, 231 F.3d 572, 584 (9th Cir. 2000) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975). "Unless and until the defendant pleads and proves a business-necessity defense, the plaintiff wins simply by showing the stated elements." *Lewis v. City of Chicago*, 130 S. Ct. 2191, 2198 (2010).

Defendants used the standards set forth in the FIT validation study when devising their own test. The validation study determined, based on extensive analysis of job-related skills, that the FIT standards measured the "minimum underlying physical ability or fitness" for performing the physical tasks of being a police officer. (Doc. 25-6, Ex. 4a at B-1). The validation study recommended that all incumbent officers and applicants meet the standards developed in the testing, because by "having absolute job-related standards for all applicants, Academy recruits and incumbents, Phoenix should have a measure of certainty that personnel can meet the strenuous and critical physical demands of the job." (Doc. 25-7, Ex. 4b at G-30).

The test standards were designed to measure the minimal fitness requirements for law enforcement officers in Phoenix. Defendants themselves note that the study "took place under circumstances that were fundamentally different from the manner in which Cottonwood utilized the test," but have presented no evidence that they modified the test in any way to make it applicable to Cottonwood. (Doc. 27 at 5). For example, Det. Kuhlt stated in her deposition that she ran a mile and a half in Phoenix while applying for other law enforcement positions, she ran nearly a minute faster than in Cottonwood, which she attributes to the difference in altitude, "because Phoenix is much lower." (Doc. 25-17, Ex. 11 at 26:2–3). There is no evidence that CPD considered adjusting the target time for the 1.5 mile run based on Cottonwood's elevation.

There are material issues of fact as to whether the test accurately measures the minimal standards necessary to be a Cottonwood police officer. Dr. Millsap challenges the test's methodology, but "[t]he question of whether a test has been validated properly is primarily a factual question, which depends upon the underlying factual determinations

regarding the content and reliability of the validation studies." *Ass'n of Mexican-American Educators*, 231 F.3d at 585. In response to Dr. Millsap's critique, FitForce acknowledged that no different standards were set forth for different departments, but stated that "our experience and feedback from the ALEA (Arizona Law Enforcement Academy) lead to the conclusion that municipal police work in the state of Arizona does not vary significantly from agency to agency." (Doc.23-2 at 6–7). If the only question were whether the study tests for a business necessity for hiring police officers, summary judgment would be inappropriate.

Plaintiffs are not arguing, however, that the test fails to measure the minimal standards needed to be a police officer in Cottonwood. They argue instead that requiring passing scores of only those officers applying to be sergeants serves no business necessity. Defendants claim that the test measures the physical capacity necessary to be a sergeant because sergeants in Cottonwood are patrol officers, and Bartosh stated that in Cottonwood, sergeants are "doing the same kind of job duties as the officers." (Doc. 25-3, Ex. 2 at 40:7–8). Even granting that the duties of a sergeant and a police officer in Cottonwood are identical, Defendants have pointed to no business necessity that required sergeants to pass the test when incumbent officers were not required to. Under GO 206, incumbent officers were granted three years in which to meet the fitness standards; Det. Kuhlt was not fired for failing the test. (Doc. 25-16, Ex. 10 ¶ B). Nevertheless, passing the test was made a requirement in the promotional process for the sergeant position. (Doc. 23-1, Ex. C). The only statement from any defendant as to why sergeants must pass the test while police officers need not do so is Bartosh's statement that "[i]f you're going to promote somebody, generally you want somebody who is going to set the example, be a leader, have credibility with the people that they're going to lead." (Doc. 23-1 at 14–17). Defendants have not argued that the FIT standards measure the ability to set examples, lead, or establish credibility. The Ninth Circuit has held that the California Highway Patrol did not meet its burden of production to show that a promotional exam met a business necessity when "it did not present any evidence regarding how the examinations actually test for the skills identified by the CHP as critical to performing well *in a particular supervisory rank*." *Paige v. California*, 291 F.3d at 1145

(emphasis added). Defendants' argument that sergeants must pass the test because their job requirements are the same as patrol officers fails because police officers were not required to pass the test for three years after the implementation of GO-206.[2]

Plaintiffs have met their burden of showing a prima facie case, and Defendants have not shown that there was a business necessity for using the test as a promotional tool when officers were not required to pass it. Plaintiffs are granted summary judgment on their disparate impact claim.

## B.    Other Claims

Defendants claim that Plaintiffs are time-barred from challenging any action that took place prior to July 11, 2007, and that Plaintiffs' claim for injunctive relief is moot. Moreover, they move for summary judgment on Plaintiffs' disparate treatment claim, their retaliation claim, and their § 1983 claim.[3] These issues will be discussed in turn.

### 1.    Timeliness

Title VII requires an employee to file a charge within three hundred days after an alleged unlawful employment practice occurred when the employee initially instituted proceedings through a state agency. 42 U.S.C. § 2000e-5(e)(1) (2006). Plaintiffs filed this charge on May 6, 2008, and Defendants argue that they therefore cannot challenge any actions that took place prior to July 11, 2007. (Doc. 24 at 8). Defendants do not deny, however, that the claim regarding Kuhlt's 2008 application is timely, or that in the Ninth Circuit, plaintiffs "are permitted to offer evidence of the pre-limitations [discrimination] in the prosecution of their timely claims." *Lyons v. England*, 307 F.3d 1092, 1108 (9th Cir. 2002). Moreover, Title VII and ACRA allow plaintiffs to recover damages incurred up to two

---

[2] In addition, GO-206 provides that officers who fail the fitness battery can instead take a "job task simulation test" ("JTST"). (Doc. 25-16, Ex. 10 ¶ D(4)(d)).

[3] Additionally, they argue that punitive damages are not available. Plaintiffs concede that punitive damages are not available, and state that Kuhlt "inadvertently" pled punitive damages in her First Amended Complaint. (Doc. 29 at 17). Any claim for punitive damages is therefore dismissed.

years prior to the filing of a claim, which Defendants also do not dispute. 42 U.S.C. § 2000e-5(e)(3)(B); A.R.S. § 41-1481(G).[4]

### 2. Mootness

In 2010, Defendants stopped administering the FIT test, using the POPAT test instead.. (Doc. 25 ¶¶ 154–55). In *Los Angeles Cty. v. Davis*, 440 U.S. 625 (1979), a disparate impact claim against a fire department challenging a civil service exam, the Supreme Court set forth a two-part test for whether a claim is rendered moot when a department stops using a challenged test during the course of litigation. Such a case is moot when "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have *completely and irrevocably eradicated* the effects of the alleged violation." *Id.* at 631 (emphasis added). The Court emphasized that "[t]he burden of demonstrating mootness 'is a heavy one.'" *Id.* (quoting *United States v. W. T. Grant Co.,* 345 U.S. 629, 632–33 (1953)). The Ninth Circuit has found that a complaint against a public agency was rendered moot following a policy change when the new policy "addresses all of the objectionable measures that [the agency] took against the plaintiffs in this case, and even confesses that this case was the catalyst for the agency's adoption of the new policy." *White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000).

Citing to *Davis* and *White*, Defendants argue that because they have replaced the FIT test with POPAT, "there is no need for an injunction." (Doc. 24 at 17). Defendants rely merely on the first prong of the *Davis* test, and do not argue that they have "completely and

---

[4] Defendants state that the two-year provision is only applicable in cases involving equitable tolling, relying on a Supreme Court dissent noting that to the two year period is a "limitation on backpay" in cases where equitable considerations would otherwise allow for more than two years of backpay. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 125 (2002) (O'Connor, J. dissenting). The statute's text provides that liability may accrue for "back pay for up to two years preceding the filing of the charge, where the unlawful employment practices that have occurred during the charge filing period are similar or related to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge." 42 U.S.C. § 2000e-5(e)(3)(B). This language does not limit the two-year recovery period to cases in which the filing deadline was equitably tolled.

irrevocably eradicated the effects of the alleged violation" or that switching to another test "addresses all of the objectionable measures" of which Defendants complained. *Davis*, 440 U.S. at 631; *White*, 227 F.3d at 1243. *Davis* involved a challenge to a county's proposal to use the results of a 1972 civil service exam to fill temporary emergency firefighter positions. *Davis*, 440 U.S. at 631. The county never followed through on the plan, and in the seven following years implemented a hiring plan in which hiring of minority applicants "consistently, though by varying amounts, exceeded 50%." *Id.* at 632. In *White*, officers of the Department of Housing and Urban Development ("HUD") launched Fair Housing Act ("FHA") investigations against people who had engaged in protected First Amendment activity. Subsequently, HUD issued a memo specifically discussing limits on FHA investigations for protected First Amendment activity, and implemented its new policy through a field handbook and training for officers, "address[ing] all of the objectionable measures" complained of and rendering the future injunctive relief moot. *White*, 227 F.3d at 1243.

In their Second Amended Complaint, Plaintiffs noted that Defendants had switched to using POPAT, but claimed that Defendants had not performed or asked any outside agency to perform a study correlating performance on POPAT with performance as a CPD sergeant or any CPD law enforcement position. (Doc. 1-7 at 141, ¶ 88–89). Defendants do not claim that POPAT has been validated as a promotional tool, but have only stated that it is used "as a graduation requirement" in Arizona police academies. (Doc. 24 at 17). Plaintiffs have not sought an injunction barring Defendants merely from using the FIT test; they ask that Defendants be enjoined "from engaging in any employment practice, including applying invalid and unnecessary physical fitness performance standards that are known to have a disparate impact on women." (Doc. Doc. 1-7 at 145, ¶ B).

In *Bouman v. Block*, 940 F.2d 1211 (9th Cir. 1991), a district court found that promotional tests in a law enforcement agency in 1975 and 1977 had a disparate impact on women, but that a 1980 test had no such impact. It nevertheless issued an injunction ordering "the County to develop a 'validated' sergeant examination and to hire female sergeants

consistent with their percentage representation as deputies." *Id.* at 1232. The Ninth Circuit held that prospective injunctive relief was not rendered moot by the 1980 test results, because "[e]ven though the performance of women may have improved on the 1980 examination, there is still no showing that it is a valid, job-related test." *Id.* at 1233. Likewise, although police academies use POPAT as a graduation requirement, Defendant has had offered no evidence that passing the POPAT is specifically related to the job of being a CPD sergeant. Plaintiffs' claim for injunctive relief is not moot, and Defendants will be enjoined from using any physical fitness test as a prerequisite for promotion unless the test has been specifically validated to measure the job requirements of the position to which the incumbent officer is seeking promotion. This suit does not involve disparate impact claims with regards to the tests as administered to applicants, and Defendants are not enjoined from using POPAT in its hiring, rather than promotional, process.

### 3.    Disparate Treatment

A plaintiff can establish a prima facie case of disparate treatment either by introducing direct evidence that an employer expressly discriminated against a job applicant or employee because of his or her gender, or by presenting indirect evidence that the plaintiff "(1) was a member of a protected class, (2) she applied and was qualified for a position which she sought, (3) despite being qualified, she was rejected, and (4) after she was rejected, the position remained open and the employer continued to seek applications from people with comparable qualifications." *Mondero v. Salt River Project*, 400 F.3d 1207, 1211 (9th Cir. 2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). When the plaintiff meets her initial burden, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. Should the defendant meet this burden, the plaintiff may nevertheless prevail if she can "show that petitioner's stated reason for [defendant's] rejection was in fact pretext."

*Id.* at 804.[5]

For the purposes of summary judgment, "the City will assume that Plaintiffs can create a factual dispute as to [the prima facie case]." (Doc. 24 at 4). Likewise, Plaintiffs make no effort to counter Defendants' well-documented argument that CPD had a long interest in establishing a fitness program and chose the FIT test after an officer reviewed the validation study issued in connection with the 2001 test. (Doc. 24 at 5).[6] Thus, Plaintiffs bear the burden of showing that Defendants' stated reason for using the FIT standards during the promotional process is mere pretext.

An employee may show that an employer's stated criterion is mere pretext if it is not "applied alike to members of all [sexes]." *McDonnell Douglas*, 411 U.S. 804.[7] A reasonable jury could find that there is sufficient evidence that Plaintiffs have met their burden based

----

[5] Plaintiffs do not cite to *McDonnell Douglas* or mention the burden-shifting analysis. Instead, they ask the Court to consider whether the challenged action would qualify as disparate treatment under regulations issued by the E.E.O.C. (Doc. 29 at 8). For this proposition, they cite to a 1975 Supreme Court case that considered whether an application test had been properly validated according to E.E.O.C. guidelines. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 434 (1975). Although the E.E.O.C. guidelines may be a proper barometer from which to measure whether a particular test has been validated, they are not a substitute for the *McDonnell Douglas* framework in a disparate treatment case, which the Court will use to evaluate Plaintiffs' claim.

[6] Plaintiffs again cite to E.E.O.C. regulations for the proposition that an employer has not satisfied its burden of putting forth a non-discriminatory reason when it states that it relied upon a study purporting to validate a test under E.E.O.C. guidelines. (Doc. 29 at 8 n.2). The burden on the defendant at this stage is "satisfied if he simply 'explains what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.'" *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (quoting *Bd. of Trustees of Keene State College v. Sweeney*, 349 U.S. 24, 25 n.2 (1978)).

[7] Defendants claim that Plaintiffs rely on circumstantial evidence of discrimination in their prima facie case, and that therefore Plaintiffs must put forward "specific and substantial" evidence of pretext. *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). In fact, much of the evidence of pretext, such as the fact that a man was given the opportunity to re-take only the item on the test that he did not pass, while women, including Det. Kuhlt, were not, also doubles as direct evidence from which a jury could find Plaintiffs have met their prima facie burden.

upon the evidence in the record. Defendants have stated reasons for using the FIT test that differ from those promulgated in the validation study and contain some inconsistencies, there is evidence that men were given leeway in passing the test while women were not, and there is evidence in the record from which a reasonable jury could conclude that CPD failed to discipline sufficiently an officer who repeatedly stated that women should not be allowed to serve in law enforcement.

Although the FIT standards say nothing regarding promotion, and CPD allowed incumbent officers to test up to the standards over three years, incumbent officers were denied the opportunity to advance if they did not meet the standards. At his deposition, Bartosh stated that the reason that the test was implemented for the promotional scheme was that "[i]f you're going to promote somebody, generally you want somebody who is going to set the example, be a leader, have credibility with the people that they're going to lead." (Doc. 23-1 at 14–17). When Chief Fanning was asked why the promotional process was revised so that a candidate had to pass the FIT test before being allowed to take the written and oral portion of the exam, the following exchange took place:

> A: If we had a candidate that failed the PFT or did not take the PFT—or we had a candidate that did not take the PFT, they could, in turn, hold up the entire process for several years. And, therefore, the candidates that were taking all the tests and passing would not be able to be promoted because we had a candidate that was not taking the PFT.
> Q: Monica Kuhlt?
> A: Right.

(Doc. 30-3, Ex. O at 152:9–20).

Defendants do not contest the fact that in July of 2007, both Lori Carver, a woman, and Clint Combs, a man, applied to join the CPD, and each failed one of the seven tests in the FIT battery.[8] They further do not contest that when Ms. Carver failed the bench press, the CPD officer administering the exam "told her she had failed the physical fitness test and that she was able to come back and contact [a CPD officer] to find out when she could retest with us." (Doc. 25-12, Ex. 7a at 175:16–19). Nor do they contest that Mr. Combs was given the

---

[8] Ms. Carver failed the bench press while Mr. Combs failed the 1.5 mile run.

opportunity to return to the CPD three weeks later and perform only the 1.5 mile run, which he then passed. (Doc. 25 ¶ 67). The same officer who provided Mr. Combs the opportunity to re-take one portion of the fitness test without having to exert himself by performing the other portions of the test acknowledged that he did not offer Ms. Carver the same opportunity, and has never offered Det. Kuhlt this opportunity, despite the fact that "I know that Monica has passed almost every one [of the tests], but at different times." (Doc. 25-12, Ex. 7a at 185: 21–22). Moreover, records show that at least one male officer was excused from taking the FIT test entirely. (Doc. 30-5, Ex. BB at COT/AZ 00398). Defendants argue that this officer was "excused from taking the fitness test . . . for medical reasons" but do not state whether this officer was thereafter placed on modified duty because he was unable to take the test, as Det. Kuhlt was. (Doc. 35-1, Ex. 1). Defendants argue that Mr. Combs had nearly passed the 1.5 mile run on his first try, and may make this argument to the jury.[9] At summary judgment, however, there is enough direct evidence in the record from which a reasonable jury could find that CPD in fact administered the test differently to male officers than it did to female officers.

Finally, Plaintiffs present evidence that Commander Jody Makuch, who supervised Det. Kuhlt, repeatedly stated, at times in connection with this lawsuit, that women should not serve as law enforcement officers. (Doc. 30-2, Ex. J at 89:17–22; Doc. 30-5, Ex. EE at 81:18–24, Doc. 30-5, Ex. FF at 62:10–12). Moreover, there is evidence that Chief Fanning, upon verifying that Commander Makuch made such statements, ordered Commander Makuch to apologize to Det. Kuhlt, but issued no other discipline and made no annotations in Commander Makuch's personnel file, even though CPD protocol requires, at minimum, that a "letter of instruction" be filed in the personnel file of any officer who makes derogatory comments based on sex. (Doc. 30-2, Ex. I-4). Defendants argue that Commander

---

[9] It appears from the record that performing all of the tasks on a single day is a key element to the test. Defendants' expert stated in his deposition that he had previously written an expert report for the Commonwealth of Pennsylvania defending the Commonwealth for dismissing a police academy recruit who had asked to take the 1.5 mile run on a separate day from the other elements of the test. (Doc. 25-10, Ex. 6 at 51:12–22).

Makuch's comments that women should not be law enforcement officers constitute only "[s]tray remarks" and therefore cannot be sufficient to establish pretext. *Mondero*, 400 F.3d at 1213. In *Mondero*, the circuit found that the fact that two employees had rhetorically asked "[t]hey bring a woman to do a man's job?" could not establish pretext for an employment decision made later by officers who were unaware that the remarks had been made. *Id.* at 1212. The court noted, however, that there was no evidence that "SRP's decision makers were influenced or even aware of the alleged gender bias of some of its agents." *Id.* at 1213. Here, there is evidence that the comments were drawn to the attention of the Chief of Police, who issued a punishment that a reasonable jury could find fell short of that required by CPD policy.

Defendants mount many arguments to Plaintiffs' claims regarding pretext. They note that Mr. Combs came relatively close to passing the 1.5 mile run on his first attempt, and that being forced to apologize to a subordinate is "a significant event in paramilitary organization" (Doc. 34 at 7 n.5). They will be free to make these arguments to the jury, but "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A reasonable jury could find that Plaintiffs have provided evidence that the stated reason for adopting the FIT test for promotion to sergeant was pretext, and summary judgment is therefore denied.

### 4.    Retaliation

To establish a prima facie retaliation claim, a plaintiff must show "1) her involvement in a protected activity, 2) an adverse employment action taken against her, and 3) a causal link between the two." *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2002). Plaintiff filed her initial claim on May 6, 2008, and claims that, starting in May of 2009, she was denied a training opportunity, subjected to an unnecessary medical examination, and placed on light duty in retaliation for her participation in the claim. (Doc. 1-7 at 15).

Kuhlt filed her initial action nearly a year before the alleged adverse action. "The

cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see also Soares-Haae v. Roche*, 220 Fed. Appx. 695, 697 (9th Cir. 2007) ("The suspension occurred almost a year after Soares-Haae filed a series of EEO complaints, so there is not a sufficient temporal proximity between the events to establish the required causality.") (internal quotations omitted). However, on March 12, 2009, after her charge had been dismissed, Kuhlt wrote CRD a four-page letter urging that the case be re-opened. (Doc. 30-3, Ex. P-1). The letter detailed additional alleged discrimination, including the fact that a male applicant had been allowed to re-take one portion of the FIT test after failing it, while a female officer had been sent home after failing one portion of the test. (*Id.*). It moreover responded to the argument in Chief Fanning's original letter that the test was valid under the standards in *Lanning v. SEPTA*, 308 F.3d 286 (3d Cir. 2002), in which a 1.5 mile run had been approved as a fitness requirement for a transit police force, by detailing the difference in responsibilities between a Cottonwood police officer and a Philadelphia transit officer. (*Id.*).

Plaintiffs allege that the retaliatory activity consisted of CPD's denying Kuhlt a training opportunity, forcing her to undergo a physical examination, and placing her on modified duty. Det. Kuhlt has received over 3,000 hours of "continuous training, proficiency training and specialized training" during her tenure with CPD. (Doc. 25-23, Ex. 46). In light of these substantial training opportunities, being scheduled for a medical appointment that required missing a single training course cannot be viewed as more than a "trivial harm[]" that does not qualify as a materially adverse employment action. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Being scheduled for such an appointment does not qualify as behavior that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (C.A.D.C. 2006)). Plaintiffs' claim regarding the loss of a training opportunity is dismissed.

Plaintiffs have shown that the mandatory medical test was adverse, and that it happened soon enough after the letter asking that her case be re-opened that a reasonable jury could conclude there was some causation. *Little* , 301 F.3d at 969. Although her doctor had cleared her for all police activity except for the 1.5 mile run, and had recommended that she take some other aerobic test, CPD sent her to another doctor who found that her contraindication to running disqualified her from serving as a police officer at all. (Doc. 25-19, Ex. 28; Doc. 25-19, Exs. 33, 35). A reasonable jury could accept Defendants' argument that Kuhlt was sent to the doctor based on the language in the release from her initial doctor, but it could also conclude that the examination and subsequent duty modification was retaliatory.

Defendant is therefore granted only partial summary judgment on the retaliation claim. Although Plaintiffs may argue that CPD sent Kuhlt for the physical examination and subsequently put her on light duty in retaliation for her letter asking that CRD re-open her case, claims that CPD retaliated based on her initial compliant are dismissed, as is the claim that denying Kuhlt the training opportunity was a materially adverse employment action.

### 5.    Section 1983

Plaintiffs have brought a claim under Section 1983 of Title 42 of the U.S. Code, which provides a cause of action for persons who have been deprived of rights "secured by the Constitution or laws" of the United States. 42 U.S.C. § 1983 (2006). Section 1983 "is not itself a source of substantive rights" but only provides a cause of action "for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

Plaintiffs' Section 1983 claim seeks relief for the "[d]enial of equal opportunity to employment based on sex in violation of 42 U.S.C. § 1983, as well as retaliation for her participation in making a charge, testifying, assisting or participating in an investigation." (Doc. 1-7 at 15). As such, it appears that the Section 1983 claim seeks relief for rights guaranteed by Title VII itself. Section 1983 claims, however, are pre-empted "where Congress has evinced an intent to preclude such claims through other legislation." *Ahlmeyer v. Nevada Sys. of Higher Educ.*, 555 F.3d 1051, 1056 (9th Cir. 2009) (holding that the ADEA

pre-empts Section 1983 claim based on violations of the ADEA). "When the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Assn*, 453 U.S. 1, 19–20, (1981). Title VII does not, of course, pre-empt claims brought under Section 1983 to vindicate rights not granted by Title VII, such as the Fourteenth Amendment's guarantee of equal protection. *See*, *e.g.*, *Fitzgerald v. Barnstable School Comm.*, 555 U.S. 246, 256 (2009) (Title IX does not pre-empt a Section 1983 claim alleging violations of the Equal Protection Clause because "the protections guaranteed by the two sources of law diverge"). Plaintiffs have, however, brought no Equal Protection claim, and may not use Section 1983 as a vehicle to bring claims for which Title VII provides a complete remedy. *See Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366 (1979) (holding that a plaintiff may not avoid the procedural requirements of Title VII by bringing the action under 42 U.S.C. § 1985(c)).

Plaintiffs' Section 1983 claim is pre-empted by Title VII, and is therefore dismissed.

## CONCLUSION

The actual results of those who took the test as administered by CPD show a significant disparity by gender. Although the sample size is small, the discrepancy is large enough for Plaintiffs to establish their prima facie case. Moreover, other evidence in the record, including Dr. Millsap's declaration and a written statement from Defendants that they do not contest that the test has a disparate impact on women, assures that Plaintiffs have met their initial burden. Defendants have offered no evidence as to why police officers had to pass the test in order to be sergeants, when they were not required to pass the test to remain on the force. Their argument that sergeants perform the same duties as police officers does not explain why the test was required only for promotion. Plaintiffs are granted summary judgment on their disparate impact claim.

The claim is timely with regards to the May 2008 promotional process, and evidence regarding the earlier processes may be presented as Plaintiffs prosecute their timely claim. The fact that CPD switched to another test during the course of this lawsuit does not render

1
2
the injunctive relief moot, since Defendants do not allege that the test they are currently using has been validated for promotion to the position of sergeant in the CPD.

3
4
5
6
7
8
9
10
The record indicates that at least one man was allowed to re-take a portion of the test that he had previously failed, while no woman has been. Moreover, a CPD officer who made repeated statements that women should not be allowed to serve as law enforcement officers was disciplined in a manner that a reasonable jury could find fell short of written CPD standards. CPD's stated reason for using the test for promotions differs from the reasons given in the FIT validation study, which makes no recommendations regarding using the test for promotions. As a result, a reasonable jury could find that CPD's stated reasons for using the test as a promotional tool are pretext for gender discrimination.

11
12
13
14
15
16
17
Det. Kuhlt's initial charge was filed too long before the alleged retaliation for a reasonable jury to find causation from temporal proximity alone. Moreover, even though she was denied one day of training, she received numerous other training opportunities, and the training loss was therefore not adequately adverse to be cognizable as retaliation for protected activity. The retaliation claim therefore survives only to the extent that Plaintiffs allege that Defendants retaliated against Kuhlt for her March letter asking CRD to reconsider her complaint by sending her for a physical evaluation and putting her on modified duty.

18
19
20
Plaintiffs' Section 1983 claim relies entirely on the law undergirding Title VII, and is therefore pre-empted. Plaintiff does not allege a constitutional violation in her Section 1983 claim.

21
**IT IS THEREFORE ORDERED**:

22
1.      Plaintiffs' Motion for Partial Summary Judgment (Doc. 22) is **granted**.

23
24
2.      Defendants' Motion for Summary Judgment (Doc. 24) is **granted in part** and **denied in part**.

25
26
27
28
a) Plaintiffs' retaliation claims (Count III and Count V) survive only to the extent that they claim that CPD retaliated against Det. Kuhlt for writing her March 9, 2009 letter asking CRD to re-open her case by sending her to a doctor for a medical evaluation and subsequently putting her on modified duty.

1           b) Plaintiffs' claim under 42 U.S.C. § 1983 (Count IV) is **dismissed**.

2           c) All other claims survive.

3       3.    Defendants are hereby **enjoined** from requiring officers seeking promotion

4   within the Cottonwood Police Department from passing a physical fitness exam as a

5   prerequisite to promotion unless the exam in question has been validated as job-related

6   specifically to the job for which the applicant is applying.

7       DATED this 20th day of July, 2012.

8

9   _____

             G. Murray Snow

10            United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28